IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BRILLIANT ALTERNATIVES,          :
INC., *et al.*,                  :
                                 :
     Plaintiffs,         :
                                 :   CIVIL ACTION NO.
v.                               :   1:09-CV-2348-RWS
                                 :
FEED MANAGEMENT                  :
SYSTEMS, INC., *et al.*,         :
                                 :
     Defendants.

## ORDER

This case comes before the Court on Plaintiffs' Motion for

Reconsideration of the Court's [117] Order [120], Plaintiffs' Motion to Compel

Discovery [121], Defendants' Motion for Summary Judgment [127], and

Plaintiffs' Motions to Supplement their Opposition Brief [144, 148]. After a

review of the record, the Court enters the following order.

**I. Factual Summary**

Robert Brill and Brilliant Alternatives, Inc. ("Brilliant") (collectively,

"Plaintiffs"), have filed this action against the Defendants Feed Management

Systems, Inc. ("FMS") and Richard Reynertson (collectively, "Defendants").

These parties' relationship began when the Plaintiffs sold all of their then-

AO 72A
(Rev.8/82)

assets, including BRILL FORMULATION® and BRILL® Toolkit, to the

Defendants' predecessor in interest in 1999. SMF, Dkt. No. [42-3] at ¶ 2; Resp.

SMF, Dkt. No. [50] at ¶ 2. As a part of this agreement, the Plaintiffs retained

the right to distribute the now-FMS products throughout the world, excluding

North and South America and Australia. Resp. SMF, Dkt. No. [50] at ¶ 2.

However, after a dispute arose in 2006, FMS filed suit against the Plaintiffs

("2006 Litigation"), and FMS ultimately terminated the distribution agreement

in 2007. Id.

In January 2008, the Plaintiffs entered into a separate agreement

("Comco-Brilliant Agreement") with Comco Systems, Inc. ("Comco") whereby

the Plaintiffs agreed to transfer, assign, and/or license certain new software

programs that were used in conjunction with or "improved upon" the FMS-

owned BRILL® software.  SMF, Dkt. No. [42-3] at ¶ 4; Resp. SMF, Dkt. No.

[50] at ¶ 4. The Plaintiffs also agreed that they would work with Comco to,

among other things, "promote Brilliant products and services, work with

Comco sales staff to coordinate sales efforts, [and] work as a member of the

Comco team." Comco-Brilliant Agreement, Dkt. No. [7-2] at art. 3. In return,

Comco agreed to "market, promote, sell, and service Brilliant Products and

2

Services," to take over the defense of the 2006 Litigation, to pay Brill a ten-thousand-dollar-a-month independent contractor fee, and pay royalties to the Plaintiffs.  SMF, Dkt. No. [42-3] at ¶¶ 5-7; Comco-Brilliant Agreement, Dkt. No. [7-2] at arts. 4-5, 7. No party could assign the rights and obligations of this agreement without the written consent of the other. Comco-Brilliant Agreement, Dkt. No. [7-2] at art. 10.2.

In executing its duties under the Comco-Brilliant Agreement, Comco then negotiated a settlement agreement with FMS to terminate the 2006 Litigation ("Settlement Agreement"). SMF, Dkt. No. [42-3] at ¶ 9; Resp. SMF, Dkt. No. [50] at ¶ 9.  Beyond the Settlement Agreement itself, FMS and the Plaintiffs also signed a Memorandum of Understanding ("MOU") and Comco and FMS ultimately entered into a Reseller Agreement, which authorized Comco to sell certain FMS products, including BRILL FORMULATION® . Resp. SMF, Dkt. No. [50] at ¶ 9; Reseller Agreement, Dkt. No. [54-1] at Sch. A.

In July 2008, Comco and FMS additionally signed a Management Agreement ("FMS-Comco Agreement"), whereby FMS agreed to manage Comco's business and to provide work direction to Brill. SMF, Dkt. No. [42-3]

3

at ¶ 12; FMS-Comco Agreement, Dkt. No. [54-1] at s. 2(a).  This contract stated that it "shall not constitute an assignment by [Comco], in part or in whole, of the [Brilliant-Comco Agreement] . . . and shall be deemed to be and be limited only to the management arrangement contemplated hereunder." FMS-Comco Agreement, Dkt. No. [54-1] at s. 7(f).

In the course of its management, FMS invited Brill to come to a series of meetings in late August 2008. SMF, Dkt. No. [42-3] at ¶ 25. At these meetings, Brill provided information regarding his "Distribution Network" which he thought would enhance the Defendants' ability to generate revenues on Comco's behalf. Id. at ¶ 26.

Shortly thereafter, in October/November 2008, Comco stopped paying Brill his monthly consultant fee and terminated the Brilliant-Comco Agreement. SMF, Dkt. No. [42-3] at ¶¶ 29-30. Plaintiffs allege that these actions were taken at FMS' request.  As a result, Plaintiffs have filed this suit, alleging: 1) tortious interference with contractual relations; 2) tortious interference with business relations; 3) fraud; 4) misappropriation of business opportunities; 5) unjust enrichment; 6) punitive damages; 7) an alternative claim that the Plaintiffs were third-party beneficiaries; 8) injunction; 9) accounting; and 10) attorneys' fees.

4

Cmpl., Dkt. No. [1]. The Defendants answered and filed counterclaims alleging: 1) trademark infringement; 2) unfair competition and false designation of origin; 3) breach of contract; and 4) tortious interference with FMS customers.

## II. Discussion

### A. Motion for Reconsideration and Motion to Compel

Plaintiffs have again filed multiple discovery motions. In its last foray into these parties' discovery issues, the Court expressly upheld the protective order which requires the requesting party to point to specific documents which they feel were over-classified and to allow the producing party a chance to reclassify the documents and confer with the movant before either party is to file a motion. Dkt. No. [117]. As a part of that order, the Court also found that FMS had over-classified documents and extended discovery for 60 days so that Plaintiffs could take additional deposition testimony which they stated they were previously unprepared to do in light of the prior over-classification. Id. And, it found that if Reynertson deleted his emails via a legitimate document-retention plan, he would not be compelled to produce documents which did not exist. Id. at 6. Finally, the Court stated the following:

AO 72A
(Rev.8/82)

> As a concluding matter, the Court notes that the Plaintiffs have
> filed five discovery-based motions in the past six months and have
> not been appropriately using the meet-and-confer process. The
> Court reminds the parties of their obligation to meet and confer
> before ever filing discovery motions. A meet and confer is
> mandatory.

Id. at 7.

On December 2, 2011, Plaintiffs followed the protective order's scheme and identified 120 documents which they felt were over-classified following FMS's production. A week later, Plaintiffs then requested that the Defendants reclassify "all financial spreadsheets" as confidential under the protective order, but Plaintiffs failed to identify any documents by Bates number or name as required. On December 15, 2011, the Defendants agreed to reclassify 101 of the 120 document that Plaintiffs had expressly requested by name; Plaintiffs do not complain about this reclassification. However, Defendants also stated that they would not reclassify the "financial spreadsheets" unless the Plaintiffs followed the protective order and specifically pointed to which spreadsheets were covered by their "financial spreadsheets" label.

On December 20, 2011, the parties had a telephonic conference in which Defendants again asked the Plaintiffs to specifically identify each spreadsheet

and the Plaintiffs declined. As well, Plaintiffs asked for additional emails from

Mr. Reynertson. Defendants explained that all documents which were in his

control and had not been deleted due to his "professional practice" to delete all

but a few emails every few months had been produced. The Plaintiffs

additionally asked that FMS produce the transaction or acquisition documents

which were created as a result of non-party Cargill's acquisition of FMS.

Plaintiffs then filed this first motion which seeks to obtain (1) the

acquisition documents from the sale of FMS to Cargill; (2) Reynertson's

deleted emails; (3) redesignation of all "financial spreadsheets," or in the

alternative, a specific list of spreadsheets attached to their motion; and (4) an

extension of the discovery period. After reviewing the briefing, Plaintiffs'

motion [120] is **DENIED**. For the same reason that the due diligence

documents were found to be irrelevant, the Court finds the acquisition

documents are irrelevant as they are even further from the temporal scope of

this suit. Further, Reynertson has stated that he has produced all emails which

were in his control and were not deleted pursuant to his document-retention

plan. Plaintiffs have produced no evidence that Reynertson deleted emails in

bad faith. And, the Court finds that Plaintiffs <u>again</u> failed to follow the

protective order by specifically stating which financial spreadsheets they wanted to be reclassified. Plaintiffs attachment of specific spreadsheets comes too late as it did not give the Defendants time to meet and confer on the issue. As a result, an extension of discovery is not warranted.

Plaintiffs' next motion [121] complains about Defendants' discovery failures in responding to Plaintiffs' Second Request for Production of Documents and each of the Plaintiffs' Second Set of Interrogatories. On December 14, 2011, Plaintiffs served all of their Second Discovery Requests on the Defendants by hand-delivery. Thus, Defendants responses and objections were due on January 13, 2011. On Saturday, January 14, 2012, Defendants responded to these requests by email. On Tuesday, January 17, 2012–which was also the date discovery closed–Plaintiffs emailed Defense Counsel Bohnen and asked whether Defense Counsel would be available later that morning for a quick meet and confer. Bohnen advised that they would not be available that day, but would be available the next day–the 18th. Three hours later, the Plaintiffs filed this motion to compel which seeks the following types of documents: 1) Cargill's acquisition documents; 2) FMS's tax returns from 2010 and 2011; 3) FMS's financial statements from 2010 and 2011; and 4) revenues

generated by the Distribution Network for the sales of FMS-owned products from 2008-present.

Yet again this Court is faced with Plaintiffs' failure to appropriately meet-and-confer, especially in light of the fact that Local Rule 37.1 would have preserved Plaintiffs' motion to compel until 14 days after Defendants' responses were made. See LR 37.1(B), NDGa ("Unless otherwise ordered by the court, a motion to compel a disclosure or discovery must be filed within the time remaining prior to the close of discovery or, if longer, within fourteen (14) days after service of the disclosure or discovery response . . .") (emphasis added). But, Defendants also failed to meet their response deadline. As a result, the Court will consider Plaintiff's motion to compel and Defendants' objections–even though both violate the Federal Rules of Civil Procedure.

In reviewing Plaintiffs motion, their first three requests are denied. As stated above, the Court finds that the acquisition documents are too far removed from this litigation and would be irrelevant. As well, the Court finds that the 2010 and 2011 tax returns and financial information would be irrelevant as those documents would contain non-specific gross income information, information which would be irrelevant to Plaintiffs' damages in this case.

9

However, the Court finds Plaintiffs are entitled to the 2008-2012 FMS sales information from the Distribution Network. As to the 2008-2009 time frame, Defendants state that they produced these documents but it is not their fault if the Plaintiffs cannot determine which documents were responsive to this request. As to the 2010-2012 time frame, Defendants argue that the information would be irrelevant. The Court finds that this information would be relevant to proving Plaintiffs' damages, and because this information solely relates to the Distribution Network, it is sufficiently limited in scope to be probative. As to the 2008-2009 time frame, the Court **ORDERS** Defendants to advise the Plaintiffs which documents–by Bates number–were responsive to this request. And as to the 2010-present time-frame, the Court **ORDERS** Defendants to produce the relevant documents. As a result of this ruling, the Court will extend discovery for fourteen (14) days for the limited purpose of designating and producing these documents only. No other type of requests or discovery should occur during this period.

B. Motion for Summary Judgment[1]

---

[1]In light of the parties' consent order [151], Plaintiffs' motions to supplement [144, 148] are **GRANTED**.

10

### 1. Legal Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'"  Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotations omitted)).  Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257  (1986).

The applicable substantive law identifies which facts are material.  Id. at 248.  A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law.  Id.  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party.

11

Id. at 249-50.

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party.  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002).  But, the court is bound only to draw those inferences which are reasonable.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(c), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

### 2. Tortious Interference with Contractual and Business Relations

Defendants first move for summary judgment on Plaintiffs' tortious interference claims. In Georgia, tortious interference with contractual relations

12

is a separate and distinct tort from tortious interference with business relations, although the two share three common elements. Britt/Paulk Ins. Agency, Inc. v. Vandroff Ins. Agency, Inc., 952 F. Supp. 1575, 1581 (N.D. Ga. 1996). Specifically, to recover under tortious interference with business relations, the plaintiff must prove that the defendant: "1) acted improperly and without privilege; 2) acted purposely and with malice or intent to injure; 3) induced a third party or parties not to enter into or continue a business relationship with the plaintiff; and 4) caused the plaintiff financial injury." Id. To recover under tortious interference with contractual relations, the plaintiff must prove elements one, two, and four of the business relations tort.  Additionally, the plaintiff must prove that the defendant "interfered with a third party's then existing contractual rights and relations"–i.e., an underlying contract must have existed. Id. at 1581-82.

However, to recover under either cause of action, the plaintiff must demonstrate that the defendant is an "intermeddler" and a "stranger" to the contract or business relationship. Id. at 1582. Under Georgia law, a defendant is not a stranger as a matter of law when

13

> 1) the defendant is an essential entity to the purported injured relations; 2) the allegedly injured relations are inextricably a part of or dependent upon the defendant's contractual or business relations; 3) the defendant would benefit economically from the alleged injured relations; or 4) both the defendant and the plaintiff are parties to a comprehensive interwoven set of contracts or relations.

Id. at 1584. Importantly, though, whether a defendant has tortiously interfered with either the plaintiff's business relationships or contractual relations is generally reserved for the jury. Id. at 1583.

The Defendants argue that they meet each of the four stranger exceptions and thus Plaintiff cannot mount tortious interference claims against them. In response, the Plaintiffs argue that Defendants would be strangers because, at the time the Brilliant-Comco Agreement was signed, the Defendants were Brilliant's legal adversaries. As well, Plaintiffs argue that Defendants did not want to do business with Brill other than one that was arm's length through Comco. And, FMS's products were not essential to Brill as the derivative software could be sold with or without FMS's authorization.

In reviewing the parties' relationship, the Court finds as a matter of law that the Defendants were not strangers to Brilliant, Comco, or the Distribution Network. At the time of the alleged interference, the parties were part of an

14

interwoven set of contracts and relations which would preclude the Defendants from being strangers. Pursuant to the Reseller Agreement, Comco and Brilliant gained the ability to sell FMS products, and through the Management Agreement, FMS was charged with managing the Distribution Network and the Plaintiffs. Essentially, through the settlement and related agreements which arose out of the Minnesota litigation, FMS became Comco's managerial agent. See Barnwell v. Barnett & Co., 476 S.E.2d 1, 2-3 (Ga. Ct. App. 1996) (applying the stranger doctrine and finding that a sales manager acting within the scope of his duties as an agent cannot be a stranger to a sales representative).[2]

However, Plaintiffs argue–without any citation to authority–that because FMS has stated that it never wanted to do business with Brill directly again, the parties could not have been in an interwoven set of contracts. However, there is no doubt that Brill owed certain duties to Comco and that Comco signed the Management Agreement in which it hired FMS to complete the day-to-day

---

[2]To the extent that Plaintiffs argue that Defendants were strangers prior to the settlement agreement as they were involved in ongoing litigation, any claim based on that time period was resolved in the settlement. See Settlement Agreement, Dkt. No. [127-19] at 7 (releasing all claims against the Defendants, including those which were unknown, on May 26, 2008).

management of Brill and the Distribution Network. Thus, FMS became Brill's contractual manager and was clearly contractually interwoven to him.

As well, the Court finds that Plaintiffs were dependent upon FMS. While the Court recognizes Plaintiffs' distinction that Plaintiffs <u>could</u> sell the Add-On products without FMS approval, the Plaintiffs continually fail to recognize that the Add-On Products would not function, however, if FMS would not grant the customer a license to the underlying BRILL® Toolkit. Thus, because FMS could have refused to sell all of Plaintiffs' customers a BRILL® Toolkit license, the FMS BRILL® Toolkit was essential to Plaintiffs' economic reality.

In their supplemental brief, Plaintiffs argue that under <u>Nottingham v. Wrigley</u>, 144 S.E.2d 749 (Ga. 1965), "the applicable circumstances of this case (and the actions of Defendants) are and should be considered to constitute an interference with the contractual and business relations of Plaintiff without regard to whether or not Defendants perpetrated their tortious conduct as 'strangers' to the Brilliant-Comco Agreement." Dkt. No. [148] at 5. In <u>Nottingham</u>, the Georgia Supreme Court found that a jury issue remained on the plaintiff's tortious interference claim when the plaintiff produced evidence that his employment contract with the corporation was terminated by the

16

corporation's officers. The Plaintiffs are correct that the Georgia Supreme Court did not address the "stranger" question in this opinion. However, this opinion was written in 1965. In 1998 the Georgia Supreme Court made clear that "in order to be liable for tortious interference, one must be a stranger to both the contract at issue and the business relationship giving rise to and underpinning the contract." Atlanta Mkt. Center Mgmt. v. McLane, 503 S.E.2d 278, 283 (Ga. 1998). Thus, to the extent that Nottingham stands for the proposition that the stranger doctrine is not a prerequisite to a tortious interference claim, Nottingham has been abrogated and has no application here. As a result, the Court finds that Defendants were not strangers to the Plaintiffs, Comco, or the Distribution Network, and Defendants' Motion is **GRANTED** as to Plaintiff's tortious interference with contractual and business relations claims.

### 3. Fraud

Defendants next move for summary judgment on Plaintiffs' fraud claim. To prove fraud in Georgia, Plaintiffs are required to prove: "(1) a misrepresentation by defendant of a material existing fact, (2) with knowledge that it was false or with reckless disregard as to whether it was true, (3) with intent to deceive plaintiff, and (4) [that] plaintiff acted upon the

misrepresentation in reasonable reliance upon its veracity in a manner which caused proximate injury." Management Assistance, Inc. v. Computer Dimensions, Inc., 546 F. Supp. 666, 671 (N.D. Ga. 1982) (citing Brown v. Techdata Corp., Inc., 234 S.E.2d 787, 790 (Ga. 1977)).

In their Opposition Brief, the Plaintiffs appear to allege two misrepresentations: 1) that "Mr. Reynertson . . . intentionally misinformed Comco that it could not market, sell, or support the Add-on products without a Brill ® Toolkit license"; and, 2) that Reynerston told Brill at the time the Management Agreement was signed that "Plaintiffs' arrangement under the Brilliant-Comco Agreement would not change, that no new agreements were necessary, and that Plaintiffs would receive commissions from the sale of FMS products as well as the Brilliant Products." Dkt. No. [138] at 63-64.[3]

As to the first misrepresentation, because that alleged statement occurred prior to the 2008 settlement, any claim based upon this statement was

_____

[3]In their initial brief, the Defendants also address the Plaintiffs' Complaint's allegations that misrepresentations occurred at the August 2008 meeting and that Defendants' renegotiation of agents' contracts were somehow nefarious. Dkt. No. [49] at 43-48. Because the Plaintiffs did not respond to these arguments in their opposition brief wherein they set out the misrepresentations at-issue, Defendants' arguments are deemed **UNOPPOSED**. LR 7.1(B), NDGa ("Failure to file a response shall indicate that there is no opposition to the motion.").

previously discharged. <u>See</u> Brill Aff., Dkt. No. [138-1] at ¶¶ 6-7 (stating that the misrepresentation occurred while the litigation was still pending); Settlement Agreement, Dkt. No. [127-19] at 7 (releasing all claims against the Defendants, including those which were unknown, on May 26, 2008).

As evidence of the second misrepresentation, Plaintiffs argue that the Management Agreement "redefines 'Brilliant Products and Services' to exclude the sale of all FMS Products." Dkt. No. [138] at 65. Essentially, Plaintiffs argue that under the original Brilliant-Comco Agreement, any software which the parties obtained rights to after the close of that agreement would be referred to as "Brilliant Products and Services" for the purposes of any Brilliant-Comco Agreement provision. <u>See</u> Dkt. No. [127-11] at 2. Thus, the right to sell FMS Products which Comco received in the Reseller Agreement would be referred to as a "Brilliant Product" under the original Brilliant Comco-Agreement. <u>Id.</u> However, when FMS and Comco drafted the Management Agreement, they made a distinction between "Brilliant Products and Services"–which it defined as intellectual property obtained from the Plaintiffs–and "FMS Products and Services"–which it defined as intellectual property gained through the Reseller Agreement. Dkt. No. [127-28]. Plaintiffs allege that this distinction proves that

19

the Management Agreement did change the Brilliant-Comco Agreement and Reynertson's statement was an intentional misrepresentation.

The Court does not find that this use of nomenclature evidences that a new agreement was necessary. While the Brilliant-Comco Agreement's terminology would more broadly define what was a "Brilliant Product," reality suggests that the FMS Products and the Brilliant Products are actually different–as evidenced by the Memorandum of Understanding. And, Plaintiffs fail to explain how this distinction in the preamble of the agreement in any way affected the Plaintiffs' rights–assuming that such existed–in the operative provisions.

However, the Plaintiffs also assert that they may not have been paid their percentage of FMS Product sales.  Plaintiffs are unable to make this claim with certainty because they have not been provided relevant discovery by Defendants.  Because the Court has decided that Defendants should have designated which documents were relevant to the 2008-2009 time-frame for the Distribution Network's FMS Product sales, the Court will **RESERVE RULING** on the fraud question <u>only</u> as to whether the new discovery creates a genuine issue of material fact  regarding whether Plaintiffs were paid the

20

percentage owed them under the Brilliant-Comco Agreement for FMS Product
Sales. Following Defendants' compliance with the production previously
ordered herein, Plaintiffs may file a supplemental response brief based on the
new discovery.  Plaintiff is only to address the additional discovery. Any new
arguments which are not based in that discovery are not to be made.

### 4. Misappropriation of Business Opportunities

Next, Defendants move for summary judgment on Plaintiffs'
Misappropriation claim. In their Opposition Brief, Plaintiffs confirm that this
count refers to O.C.G.A. § 51-12-30. However, that statute does not create a
cause of action in this context. As the Georgia Court of Appeals has stated,
"O.C.G.A. § § 51-12-30 . . .  concerns joint and several liability of joint
tortfeasors and does not establish a cause of action for interference with
economic relationships." Project Control Servs. v. Reynolds, 545 S.E.2d 593,
598 (Ga. Ct. App. 2001). As an interference claim is Plaintiffs' intended use of
this statute, Defendants' Motion is **GRANTED** on Plaintiffs' misappropriation
claim.

21

### 5. Unjust Enrichment

"For unjust enrichment to apply in either law or equity [in Georgia], the party conferring the labor and things of value must act with the expectation that the other will be responsible for the cost." Hollifield v. Monte Vista Biblical Gardens, Inc., 553 S.E.2d 662, 670 (Ga. Ct. App. 2001) (citing Engram v. Engram, 463 S.E.2d 12, 12 (Ga. 1995)). Plaintiffs argue that FMS "took over" the Brilliant-Comco Agreement and improperly "stole" the information that Brill provided at the August 2008 meeting, including the Distribution Network. However, the Court finds that unjust enrichment does not apply because Plaintiff did not expect that FMS would be responsible for the cost of information Brill provided at the August 2008 meeting. Rather, Brill clearly had an obligation to Comco to provide such information and understood that Comco would be responsible for providing him the appropriate remuneration via his consulting fee, etc. See Dkt. No. [127-4] at ¶ 35. Moreover, to the extent FMS took anything from anyone, FMS would have "stolen" the information from Comco–not the Plaintiffs. At the time of the meeting, Plaintiffs had transferred to Comco any rights they had in the disseminated information by virtue of the Brilliant-Comco Agreement. If Comco did not pay Brill the consulting fee as

22

promised in the Brilliant-Comco Agreement, that is an appropriate suit for

breach of contract against Comco (which Plaintiffs have already litigated), not

unjust enrichment against the Defendants. See Management Agreement, Dkt.

No. [127-28] at 2 (stating the Comco was solely responsible for paying Brill).

### 6. Third-Party Beneficiary Claim

As well, Defendants move for summary judgment on Plaintiffs' third-

party beneficiary claim. Essentially, Plaintiffs allege that they can recover for

FMS's management failures as Plaintiffs are third-party beneficiaries of the

Management Agreement. Because the Management Agreement is governed by

Minnesota law, Minnesota law also governs this inquiry. Management

Agreement, Dkt. No. [127-28] at 6 ("This Agreement shall be governed by, and

enforced in accordance with, the laws of the State of Minnesota . . . .").

Minnesota follows the Restatement (Second) of Contracts which provides that a

third-party beneficiary can only sue on a contract if that beneficiary was

intended. Cretex Cos. v. Construction Leaders, Inc., 342 N.W.2d 135, 139

(Minn. 1984). To determine whether a third-party beneficiary was intended, the

Minnesota Supreme Court has adopted two tests: "first, an 'intent to benefit'

test, i.e., the contract must express some intent by the parties to benefit the

AO 72A
(Rev.8/82)

third-party through contractual performance; and, second, a 'duty owed' test,
*i.e.*, that the promisor's performance under the contract must discharge a duty
otherwise owed the third party by the promisee." Id. at 138.

It appears from Plaintiffs' briefing that Plaintiffs contend they were third-
party beneficiaries of FMS's agreement to manage the Plaintiffs and to handle
all billing, including the Plaintiffs' payments. See Dkt. No. [138] at 81-83. In
reviewing the Management Agreement, it appears that the Plaintiffs were
intended beneficiaries of the management provision. That provision stated that
FMS would provide "work direction to Brill as an independent contractor to
[Comco] in order to enable Brill to fulfill his obligations under the Acquisition
Agreement." Dkt. No. [127-28] at 3 (emphasis added). Thus, the contract
expressly states that FMS's management intends to benefit Brill in that it allows
him to fulfill his obligations under the Brilliant-Comco Agreement. However,
the Court does not find that Plaintiffs were intended beneficiaries of the
payment provision. While the contract initially states that FMS is responsible
for "billing, collecting, and paying the agents which comprise the Distribution
Network," id. at 2, the contract goes on to state that Comco, "not FMS, shall be
solely responsible for . . . any and all payments to Brill for consulting services,

24

royalties and any other amounts due to Brill from [Comco] as contemplated in the [Brilliant-Comco Agreement]." Id. at 3. Thus, FMS was never responsible for paying the Plaintiffs in connection with the Brilliant-Comco Agreement or the Management Agreement. Thus, under either test, Plaintiffs are not intended beneficiaries of the Management Agreement's payment provision.

While the Court does find Brill was an intended beneficiary of the management provision, the Court does not find that Plaintiffs have produced any evidence that FMS failed in its management. Plaintiffs allege that they have created an issue of material fact on this issue because FMS "took over" the Brilliant-Comco Agreement and Reynertson stated in his deposition "that the management responsibilities of FMS did not extend to direct management or control over Mr. Brill, and 'distanced' both himself and FMS from such responsibilities." Dkt. No. [138] at 83. But, in reading the actual deposition testimony, the Court finds that most of the citations are irrelevant to this inquiry, some do not exist,[4] and the ones that deal with management do not state

---

[4]Out of an abundance of caution, the Court construes Plaintiffs' citations to pages 354-372 of Reynertson's deposition as citations to pages 254-272, as there are no substantive pages in the 300s within that deposition and pages 254-272 are relevant to the management question.

that FMS "distanced" themselves from managing Brill. Plaintiffs have not pointed to any way in which FMS's management failed. In fact, this may be because under the actual Brilliant-Comco Agreement, Comco could request that "Mr. Brill perform no duties at all on behalf of Comco." Brilliant-Comco Agreement, Dkt. No. [127-11] at 5. The only evidence before the Court regarding FMS's management is that when Comco directed FMS to manage Brill–*i.e.*, the August 2008 meeting–FMS complied. Thus, the Court finds Defendants' motion is **GRANTED** as to the third-party beneficiary claim.

### 7. Injunction

As Plaintiffs did not respond to Defendants' arguments against their injunction request, that argument is deemed **UNOPPOSED** and Defendants' Motion is **GRANTED**.

### 8. Accounting, Punitive Damages, and Attorneys' Fees

In light of its ruling on the fraud count, the Court will **RESERVE RULING** on these issues until the supplemental briefing is filed. The parties are not to address these matters in their supplemental briefs; their original briefing will control.

AO 72A
(Rev.8/82)

**III. Conclusion**

As a result of the foregoing, Plaintiffs' Motions to Supplement their Opposition Brief [144, 148] are **GRANTED**. Plaintiffs' Motion for Reconsideration of the Court's [117] Order [120] is **DENIED**, and Plaintiffs' Motion to Compel Discovery [121] is **GRANTED, in part** and **DENIED, in part**. Defendants are **ORDERED** to designate which documents are responsive to the 2008-2009 Distribution Network's FMS Products sales documents request and are **ORDERED** to produce the FMS Products sales documents for 2010-present within fourteen (14) days of this order. If Plaintiffs have any concerns with Defendants' production, Plaintiffs must meet and confer. If that process does not yield positive results, the parties are to then call the Court's deputy clerk regarding the issue. Plaintiffs are **NOT** to file a motion to compel.

As well, Defendants' Motion for Summary Judgment [127] is **GRANTED, in part**. The Court **RESERVES RULING** on Plaintiffs' fraud, accounting, punitive damages, and attorney's fees claims. After discovery closes, Plaintiffs have twenty-one (21) days to file a supplemental brief which <u>solely</u> discusses how Defendants' amended discovery affects its fraud claim; Plaintiffs are not to restate any prior grounds or state any new arguments which

AO 72A
(Rev.8/82)

do not relate to the new discovery. Following that supplemental brief,

Defendants will have fourteen (14) days to file a response thereto. The parties

(*i.e.*, each side) will each be limited to ten (10) pages for the supplemental

briefing.

     **SO ORDERED**, this ⎯7th⎯ day of May, 2012.


RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

28